IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 7, 2013

# IN RE THOMAS A. H.[1]

**Appeal from the Juvenile Court for Jefferson County**
**No. 1200702    Hon. Benjamin Strand, Jr., Judge**

_____

**No. E2013-01449-COA-R3-PT-FILED-FEBRUARY 21, 2014**

_____

This is a termination of parental rights case in which the Tennessee Department of Children's Services filed a petition to terminate the parental rights of Mother to the Child.  Following a bench trial, the trial court found that clear and convincing evidence existed to support the termination of Mother's parental rights on the statutory grounds of persistence of conditions and mental incompetence and that termination of her rights was in the Child's best interest. Mother appeals.  We affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and THOMAS R. FRIERSON, II, J., joined.

Daniel P. Hellman, Sevierville, Tennessee, for the appellant, Brenda H.

Robert E. Cooper, Jr., Attorney General and Reporter, and Alexander S. Rieger, Assistant Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee, Department of Children's Services.

Jessica S. Sisk, Newport, Tennessee, guardian ad litem for the minor, Thomas A. H.

_____

[1]This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last name of the parties.

**OPINION**

**I. BACKGROUND**

Thomas A. H. ("the Child") was born to Brenda H. ("Mother") and Billy H. ("Father") on August 8, 2000. Mother and Father were cousins and never married. Father failed to maintain a relationship with the Child, leaving Mother to care for the Child with the help of other family members.[2] The Child was subsequently diagnosed with Autism and was found to be intellectually disabled. While in Mother's care, the Child attended special education classes.

On October 22, 2010, the Tennessee Department of Children's Services ("DCS") removed the Child from Mother's care because the Child was found living in unsanitary and unsafe conditions. The removal petition provided, in pertinent part,

> [T]he home was observed to be in deplorable condition. The toilet of the home was not working, a window was broken in the front door, bottles filled with urine were in the floor in the home, there were holes observed in the walls, ceiling and floor, dog feces, an overflowing spittoon and a bucket that appeared to contain human feces.

The Child was subsequently adjudicated as dependent and neglected. DCS developed a permanency plan, which required Mother to complete a psychological assessment, maintain a safe and stable home, obtain a source of income, pay child support, and visit the Child. On June 22, 2012, DCS filed a petition to terminate Mother's parental rights to the Child. DCS alleged that termination of Mother's parental rights was supported by the statutory grounds of abandonment, persistence of conditions, and Mother's mental incompetence. A hearing was held at which several witnesses testified.

Lisa Layne, the Assistant Director of Program Services for King's Daughters' School Center for Autism, testified that she oversaw the health services and case management for children placed at her school. She related that she had been the Child's case manager for approximately two years. She said that the Child was considered "mentally retarded," was autistic, and suffered from attention deficit hyperactivity disorder and asthma and that he had been prescribed a variety of medications. She stated that at ten years old, he functioned "below a three-year-old level," that his attention span was "[s]lim to none," and that he required "consistency and routine." She claimed that the medication allowed him to focus

---

[2]Father's parental rights were also terminated. He was not present at the hearing and did not appeal the court's decision.

for approximately five minutes on activities that he enjoyed but that he had a "very limited vocabulary" and was difficult to understand. She said that he needed assistance with "all activities of daily living," namely showering, brushing his teeth, and dressing himself. She related that he was becoming "increasingly difficult" because of the onset of puberty. She stated that he was aggressive, withdrawn, and had difficulty forming attachments or bonds with people beyond general recognition of those he interacted with on a regular basis.

Ms. Layne testified that she was generally responsible for supervising the Child's visits with Mother. She recalled that Mother engaged with the Child as if they were "on the same level" and that the Child recognized Mother as his mom. She claimed that after visitation, the Child was not distraught and never asked for Mother or talked about her. She acknowledged that Mother called on a "regular basis" to ask about the Child and to talk with the Child. She believed that "it would be very hard for anyone to parent [the Child] with his special needs" and that adjusting his placement "would pose a risk to the community" and the person charged with his care. She also believed that Mother was not capable of ensuring that the Child complied with his routine. She stated that he needed constant supervision for his safety and the safety of others. She was unsure as to how long the Child would require such a high level of care because of his aggression that was often displayed by random and impulsive behaviors.

Beth Stuart, a special education teacher at Jefferson Elementary School, testified that she taught the Child, who was placed in her school from 2006 until he was removed from Mother in 2010. She claimed that she worked with the Child for the entirety of his placement at the school even though he was only in her classroom for the first two years. She recalled that he was autistic and suffered from behavioral disorders and language delays. She stated that he did not speak frequently and had very little academic skills. She related that the Child had already been identified as developmentally disabled prior to his enrollment in her school. She learned that he had in-home services before he was old enough to attend school and that he went to a developmental preschool prior to enrolling in her school. She recalled that the Child was still wearing diapers when he was placed in her class but that he was eventually trained prior to his entry into fourth grade. She claimed that he often arrived at school with a diaper but that they would provide him with underwear and allow him to use the bathroom throughout the day.

Ms. Stuart stated that Mother was involved in the Child's team meetings even though Mother's main concern was simply obtaining assistance in training the Child to use the bathroom. She believed that Mother was confused about the Child's placement in special education curriculum because Mother often asked when the Child would advance to the next grade. She related that the Child had been prescribed a variety of medications and was initially resistant to their attempts to give him his medication. She claimed that Mother did

not seem cognizant of the Child's needs for medication but acknowledged that Mother sent appropriate medication when the Child suffered from a cold or cough. She asserted that the Child was usually dirty when he arrived at school and that sometimes he was wearing three or four diapers. When she asked Mother about the diapers, Mother stated that she used several diapers because the Child often soaked through them before she was able to change him. She recalled that she and other staff members often cleaned the Child with baby wipes because the facility did not have an area in which they could really give him a bath. She believed that the Child enjoyed being clean and that they helped him by cleaning and trimming his fingernails in addition to wiping him down with baby wipes. She also provided Mother with clothes for the Child and on at least one occasion, she transported Mother and the Child to a doctor's appointment because Mother did not have transportation. She claimed that Mother's personal hygiene was also "poor."

Ms. Stuart claimed that Mother's home was generally dirty and that the Child did not have access to a bathroom and was forced to use a bucket. She related that on at least two occasions, the Child was afraid to use the bathroom at school and that the Child also exhibited signs of sexual abuse when they attempted to clean him. Mother denied the instances of sexual abuse. She believed that Mother was not effectively parenting the Child, who had gradually become more aggressive. She acknowledged that the Child and Mother had bonded and that at times, Mother was able to understand her suggestions for parenting the Child and successfully implemented the suggestions outside of school. She claimed that despite progress in some areas, the Child would always need some level of supervision.

Emily Harris, a family service worker for DCS, testified that she served as the Child's case manager. She stated that Mother failed to visit the Child on a regular basis and never remitted child support. She acknowledged that the Child was placed at a school that was several hours from Mother and that Mother relied on supplemental security income for survival. She related that DCS provided transportation for Mother, paid for Mother's gasoline when they did not provide transportation, and also scheduled and paid for her psychological examination. She claimed that she had difficulties communicating with Mother, who changed her telephone number often and moved several times. She acknowledged that Mother no longer lived in the residence that was deemed unsafe and unsanitary but claimed that Mother's new residence was in "about the same condition" as the initial residence. She explained that the newest residence, a mobile home, no longer had the proper underpinning, that the metal side of the house had been torn off and posed a safety risk, that the front porch appeared unstable, that the house was generally dirty, and that the Child would not have a room if he were returned to the residence. She stated that the Child would have to sleep in the closet because an unrelated tenant occupied the spare bedroom. She acknowledge that her last visit to the residence revealed some improvements but claimed that the Child still did not have a designated living area.

Ms. Harris stated that in addition to the unsafe living environment, she was also concerned about Mother's cognitive functioning as it related to the Child. She claimed that Mother did not understand why the initial living situation was unsuitable or why the new living situation posed several of the same safety risks. She also reviewed the psychological assessment, which revealed that Mother did not have the knowledge or ability to parent the Child. She acknowledged that Mother showed concern for the Child. However, she asserted that the Child was incapable of forming a relationship with Mother, that Mother did not have the ability to make the changes necessary to parent the Child, and that Mother would always need direction regarding how to parent the Child. She stated that she only orally advised Mother, who had trouble reading, regarding what was needed to provide a suitable home. She agreed that she could have provided Mother with a list of suggested changes.

Ms. Harris testified that the Child was autistic, had attention deficit hyperactivity disorder, and was considered "mentally retarded." She did not believe that Mother could provide for the Child, who had done well with his current placement. She acknowledged that despite his progress, the Child's increasingly aggressive behavior prevented them from placing him in a foster home.

Regarding Mother's mental competency, DCS admitted depositions from Bruce G. Seidner, Ph.D. and Kathrin Ritter, a graduate student in the University of Tennessee's Psychological Clinic. Dr. Seidner, who was qualified as an expert in psychology and forensic assessment, testified that he served as Ms. Ritter's clinical supervisor when Ms. Ritter administered several tests to Mother. He related that Ms. Ritter performed the "Wechsler Adult Intelligence Scale," the "Woodcock Johnson," test and the "General Ability Measure for Adults." He claimed that by signing the evaluation, he adopted the evaluation report as his own. He asserted that Ms. Ritter's testing revealed that Mother was "really struggling in the areas of daily functioning and social facility and expressing herself." He related that Mother's adaptive functioning could be increased through a program that allowed dual foster parenting, but he explained that Mother could not be rehabilitated to a level where she could parent the Child by herself because she was neurologically and intellectually disabled. He asserted that she would "always require a very high level of intervention and support in order to meet the need of a child, let alone a special needs child."

Ms. Ritter testified that she evaluated Mother on two separate occasions for several hours at a time. She recalled that Mother "displayed poor body and dental hygiene" and that it was difficult to understand Mother, who spoke with a lisp and had difficulty pronouncing words and expressing herself. She stated that Mother appeared depressed, anxious, worried, and agitated throughout the evaluations. She claimed that Mother was able to read and write "at the level of a first or second grader." According to Ms. Ritter's report, Mother met the intellectual deficit criterion of "mental retardation" and was functioning at a low adaptive

level. Ms. Ritter found that Mother's performance suggested that Mother had "significant difficulty caring for herself and functioning adaptively on a daily basis" and that her "difficulties likely affect[ed] her ability to parent a child of special needs." Additional testing suggested that Mother lacked the "skills necessary to respond adequately to [the Child's] needs" and that it was "unlikely" that Mother possessed "the adequate resources and skills to effectively parent [the Child]."

Following the presentation of the above evidence, the trial court declined to terminate Mother's parental rights on the ground of abandonment for failure to support and failure to visit. However, the court held that despite DCS's reasonable efforts, the conditions which led to the removal persisted, that there was little likelihood that the conditions would be remedied, and that the continuation of the Child's relationship with Mother would greatly diminish the Child's chances of early integration into a safe and stable home. The court further held that Mother lacked the mental capacity to adequately provide for the Child and that it was unlikely that she would be able to resume the care and responsibility of the Child in the near future. The court likewise found that termination of Mother's parental rights was in the best interest of the Child. This timely appeal followed.

## II. ISSUES

We consolidate and restate the issues raised on appeal by Mother as follows:

A. Whether despite reasonable efforts by DCS, clear and convincing evidence supports the trial court's termination of Mother's parental rights to the Child pursuant to Tennessee Code Annotated section 36-1-113(g)(3).

B. Whether clear and convincing evidence supports the trial court's termination of Mother's parental rights to the Child pursuant to Tennessee Code Annotated section 36-1-113(g)(8).

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

> (1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

> (2) [t]hat termination of the parent's or guardian's rights is in the best interest [] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149

S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2010, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

> A reviewing court must review the trial court's findings of fact de novo with a presumption of correctness under [Rule 13(d) of the Tennessee Rules of Appellate Procedure]. *See In re Adoption of A.M.H.*, 215 S.W.3d [793,] 809 [(Tenn. 2007)]. In light of the heightened burden of proof in proceedings under [Tennessee Code Annotated section] 36-1-113, the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim. *State Dep't of Children's Servs. v. Mims*, 285 S.W.3d [435,] 447-48 [(Tenn. Ct. App. 2008)]; *In re Giorgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006); *In re S.M.*, 149 S.W.3d 632, 640 n. 13 (Tenn. Ct. App. 2004). Appellate courts conduct a de novo review of the trial court's decisions regarding questions of law in termination proceedings. However, these decisions, unlike the trial court's findings of fact, are not presumed to be correct. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010)]; *In re Adoption of A.M.H.*, 215 S.W.3d at 809.

*In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010).

## IV. DISCUSSION

### A.

Mother argues that DCS failed to sufficiently establish that it made reasonable efforts to reunite her with the Child before initiating termination proceedings based upon the ground of persistence of conditions. She claims that despite DCS's shortcomings, the conditions which led to removal had largely been remedied and that DCS failed to establish that the remaining conditions would not be remedied. She contends that the continuation of her relationship with the Child would not impede his transition into a stable home when he had not even been placed in foster care. DCS responds that despite its reasonable efforts, Mother was simply not able to provide a safe and sanitary home for the Child.

Under Tennessee law, a court may terminate parental rights when:

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal *or* other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3) (emphasis added). Termination of parental rights requires clear and convincing evidence of all three factors. *In re Valentine*, 79 S.W.3d at 550.

Once a child has been removed from a parent's home, DCS is tasked with making it possible for the child to return home before instituting termination proceedings. Tenn. Code Ann. § 37-1-166(a)(2). At the termination proceeding, DCS must prove by clear and convincing evidence that reasonable efforts were made to reunite the child with the parent. Tenn. Code Ann. § 37-1-166(b). For purposes of DCS's involvement, the term reasonable efforts refers to "the exercise of reasonable care and diligence by the [DCS] to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). "The reasonableness of [DCS's] efforts depends upon the circumstances of the particular case." *In re Giorgianna H.*, 205 S.W.3d 508, 519 (Tenn. Ct. App. 2006).

"While [DCS's] reunification efforts need not be "herculean," DCS must do more than simply provide the parents with a list of services and send them on their way." *Id.* "[DCS] employees must use their superior insight and training to assist the parents in addressing and completing the tasks identified in the permanency plan." *Id.* These "employees have an affirmative duty to utilize their education and training to assist parents in a reasonable way to address the conditions that led to the child's removal and to complete the tasks stated in the plan." *In re R.L.F.*, 278 S.W.3d 305, 316 (Tenn. Ct. App. 2008). In keeping with this ideal, DCS must provide an affidavit, identifying its reasonable efforts, for

the court's consideration. Tenn. Code Ann. § 37-1-166(c); *see In re R.L.F.*, 278 S.W.3d at 317. In determining whether the efforts used by DCS were reasonable, the court should consider the Department's affidavit and the following factors:

> (1) the reasons for separating the parent from his or her children,
>
> (2) the parent's physical and mental abilities,
>
> (3) the resources available to the parent,
>
> (4) the parent's efforts to remedy the conditions that required the removal of the children,
>
> (5) the resources available to [DCS],
>
> (6) the duration and extent of the parent's remedial efforts,
>
> (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and [DCS's] efforts.

*In re Giorgianna H.*, 205 S.W.3d at 519. However, "'[r]eunification of a family is a two-way street, and the law does not require [DCS] to carry the entire burden of this goal." *State Dep't. of Children's Servs. v. S.M.D.*, 200 S.W.3d 184, 198 (Tenn. Ct. App. 2006) (quoting *In re R.C.V.*, No. W2001-02102-COA-R3-JV, 2002 WL 31730899, at *11 (Tenn. Ct. App. Nov. 18, 2002)). "Thus, parents desiring the return of their children must also make reasonable and appropriate efforts to rehabilitate themselves and to remedy the conditions that required [DCS] to remove their children from their custody." *In re Giorgianna H.*, 205 S.W.3d at 519.

Ms. Harris submitted several affidavits documenting her efforts in reuniting Mother with the Child. The affidavits reflect her continued contact with Mother, her coordination of Mother's visitation with the Child, and her scheduling of Mother's psychological evaluation. Ms. Harris attested that Mother initially made "vast improvements" in the home but that despite Mother's maintenance of the vast improvements, the Child no longer had a designated bedroom because Mother invited two additional people into the home. Ms. Harris noted that Mother eventually left the home to live with relatives in July 2011. In the termination petition, Ms. Harris asserted that other conditions in the home existed that would lead to further abuse or neglect of the Child. Ms. Harris noted that the Child had mental health needs that required a greater level of care than Mother could provide with her limited

cognitive abilities. Likewise, Ms. Harris testified at trial that the new residence appeared unsanitary and unsafe and that the Child still did not have a designated bedroom.

Having reviewed the evidence, we believe that DCS took great measures to reunite Mother with the Child. Mother's limited cognitive ability greatly impaired DCS's efforts and qualified as additional conditions that prevented the Child's safe return. There is little likelihood that the additional conditions, namely Mother's limited cognitive ability, will ever be remedied. While the Child had not been placed in an adoptive home, he had made improvements such that the continuation of Mother's limited relationship greatly diminished his integration into a safe, stable and permanent home. With these considerations in mind, we conclude that the record contains clear and convincing evidence that DCS made reasonable efforts to assist Mother and that the evidence does not preponderate against the trial court's finding that a statutory ground existed for termination of her parental rights based upon the persistence of conditions which led to removal.

B.

Only one statutory ground must be established by clear and convincing evidence to justify termination of Mother's parental rights. Tenn. Code Ann. § 36-1-113(c). In the event of further appellate review, we will consider the second statutory ground of mental incompetence. Mother argues that the evidence was insufficient to establish her mental incompetence concerning her ability to parent the Child. She claims that the trial court improperly relied upon a report that was two years old and that Mother's interactions with the Child's teachers illustrated her true abilities. DCS responds that the trial court correctly ruled that Mother's parental rights should be terminated due to her mental incompetence.

Under Tennessee law, a court may terminate parental rights when clear and convincing evidence is provided to establish that:

> (i) The parent . . . of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's . . . mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent . . . will be able to assume or resume the care of and responsibility for the child in the near future; and
>
> (ii) That termination of parental . . . rights is in the best interest of the child[.]

Tenn. Code Ann. § 36-1-113(g)(8)(B). DCS bears the burden of demonstrating "by clear and convincing evidence both that [the parent] is presently unable to care for the children and that it is unlikely that [the parent] will be able to do so in the near future." *In re Keisheal*, No.

M2012-01108-COA-R3-PT, 2013 WL 440061, at *7 (Tenn. Ct. App. Feb. 4, 2013) (citing Tenn. Code Ann. § 36-1-113(g)(8)). The statute also expressly provides that no finding of willfulness is required to establish this ground. Tenn. Code Ann. § 36-1-113(g)(8)(C).

Mother provided no witnesses to testify as to her competency. Instead, she relied upon testimony from the Child's former teachers concerning her ability to comply with their basic recommendations concerning the Child in 2010. Interestingly, Mother then casts doubt upon the psychological evaluation because it was produced in 2011. We commend Mother's care and concern for the Child because it is rarely seen in such proceedings; however, the record reflects that Mother is simply not equipped to care for a child that has significant special needs. With these considerations in mind, we conclude that DCS proved by clear and convincing evidence that Mother is (1) presently incompetent to adequately provide for the care and supervision of the Child because of mental impairment and (2) such mental impairment is so likely to remain that it is unlikely that Mother will be able to resume care or responsibility for the Child in the near future. Accordingly, a second statutory ground supported the termination of Mother's parental rights.

## C.

Having concluded that there was clear and convincing evidence supporting the statutory grounds for termination, we now consider whether termination of Mother's parental rights was in the best interest of the Child. Although Mother has not appealed the court's best interest finding, we have reviewed the issue because of the gravity and finality that this decision will have on Mother's parental rights. *See In re Arteria H.*, 326 S.W.3d 167, 184 (Tenn. Ct. App. 2010) (considering the best interest issue even though the issue was not raised on appeal). Following our review, we conclude that there was clear and convincing evidence to establish that termination of Mother's parental rights was in the best interest of the Child pursuant to Tennessee Code Annotated section 36-1-113(i). Accordingly, we affirm the trial court's termination of Mother's parental rights.

## V. CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Brenda H.

_____
JOHN W. McCLARTY, JUDGE

-12-